GRIFFIN v. THOMPSON BROS. LUMBER CO. †

(Court of Civil Appeals of Texas. Galveston. Jan. 23, 1912. Rehearing Denied Feb. 22, 1912.)

1. MASTER AND SERVANT (§ 217*)—INJURIES —ASSUMPTION OF RISK—KNOWLEDGE.

Where the outside timber on a lumber dock from which lumber was loaded into cars slanted slightly, a servant who knew of that condition assumed the risk of a fall from stepping on it.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. §§ 574–600; Dec. Dig. § 217.*]

2. MASTER AND SERVANT (§ 285*)—INJURIES— ACTIONS—EVIDENCE.

In an action by a servant, injured by falling from a timber dock, evidence held insufficient to go to the jury upon the issues of the looseness or slickness of the outside timber.

[Ed. Note.—For other cases, see Master and Servant, Dec. Dig. § 285.*]

Appeal from District Court, Tyler County; W. B. Powell, Judge.

Action by C. T. Griffin against the Thompson Bros. Lumber Company. From a judg-

ment for defendant, plaintiff appeals. Affirmed.

J. A. Harper and Joe W. Thomas, for appellant. J. A. Mooney and Crook, Lord & Lawhon, for appellee.

PLEASANTS, C. J. This suit was brought by appellant against the appellee to recover damages for personal injuries, alleged to have been caused by the negligence of the appellee.

At the time he was injured, the plaintiff was in the employment of the defendant, and was engaged in the work of loading cars with lumber from the timber dock of defendant's sawmill. The circumstances under which the injury occurred and the acts of negligence charged against the defendant are thus stated in the petition: "That in doing the work of loading cars it was plaintiff's duty to step from the car to the timber dock. That said timber dock was constructed and maintained by the defendant company. That the dock was about 9 feet high, with large sills, about 10 by 12 inches, resting upon pillars, and was floored with 2 by 12 inch timbers resting upon sleepers, about 3 by 6 inch timbers. That a timber 6 by 6 inches was placed on the edge of said dock, running lengthwise with the said dock parallel with the railroad track, upon which track the car being loaded was. The said 6 by 6 timber so placed was fastened by means of bolts extending from the bottom side up through the said sills and said 6 by 6 inch timber; the top end of the bolts being secured by nuts, by means of which the 6 by 6 inch timber was supposed to be held firmly to the sleepers and stationary in its place. That on the 23d day of September, 1910, the plaintiff, while performing the work assigned to him, in stepping from the car to the dock, which was done in the usual manner, and the only means he had in passing from the car to the dock, his foot slipped, and he fell to the ground below, because of the said timber turning; it not being securely fastened and stationary, as he thought that it was—that is, the defendant company had insecurely fastened and permitted to remain the said 6 by 6 inch timber, and upon the weight of plaintiff thereon in stepping from the car, turned over, throwing him to the ground. That the defendant company acted negligently and carelessly in failing to keep in repair its said dock, and in permitting to remain the said loose timber, which was so insecurely fastened, and to be and remain slanting. That said 6 by 6 inch timber was worn sleek and almost a perfectly smooth surface on top. All of which was known or might have been known to the defendant company by the exercise of ordinary care. But that the defendant company acted negligently and in default in failing to provide the plaintiff with a safe place to work as was its duty to do, in that said timber was permitted to remain while loose and sleek on the top surface, which was known or might have been known to defendant to be dangerous. Plaintiff being inexperienced, and defendant, knowing it, negligently failed to warn him of such dangers and defects, as was its duty."

The defendant answered by general denial and special pleas of contributory negligence and assumed risk.

After hearing the evidence, the trial court instructed the jury to return a verdict for defendant. This instruction is in the following language: "The evidence in this case shows that the plaintiff knew, or should have known by the use of ordinary care, the condition of the six-inch guard rail, and as such he assumed the risk and danger incident thereto, and you will therefore find in favor of the defendant." In obedience to this charge, the jury returned a verdict for the defendant, and judgment was rendered in accordance therewith.

Succinctly stated, the facts disclosed by the evidence are as follows: At the time he was injured, plaintiff was 26 years old, and had been working for the defendant at its sawmill for several months. He had previously worked some time for the Kirby Lumber Company, and was experienced in handling timber, and knew all about the construction of loading docks, and the method of loading lumber from such docks onto railroad cars. The timber dock from which the plaintiff was loading the timber was about 9 feet high. It was a strongly built platform, supported by pillars. The railroad track on which the car that was being loaded stood ran alongside of this dock. On top of the dock and extending along its outside edge next to the car, there was a piece of 6x6 timber, called a "guard rail," which was fastened to the floor of the dock by iron bolts. These were heavy iron bolts, and went through the guard rail and the floor and sills of the dock, and were securely fastened with taps. Underneath the taps were heavy iron washers, which prevented the tap from sinking into the timber, and in that way allowing the bolts to become loose. This guard rail was put there to act as a bumper, and hold heavy timbers that were skidded down on the dock from a larger storage platform or doleway adjoining the loading dock on the opposite side from the railing, and which was several feet higher than the dock. The frequent striking of the guard rail by the timbers that were skidded down on the dock from the higher platform had caused a slight bend in the bolts which held the rail, and because of this the rail leaned or slanted a little towards the railroad track. This slant was only a fraction of an inch. While plaintiff, with the assistance of a negro, was engaged in loading lumber from the dock on the car, he attempted to step from the partially loaded car onto the dock, and in doing so his foot slipped from

the guard rail, and he fell between the dock and the car and was injured. The distance between the car and the dock was about 3 feet.

On direct examination, the plaintiff testified: "I did not know that piece of timber was loose and in that condition before I stepped on it. I did not know it would cause me to fall. At the time I was hurt, I was. doing the usual manner of work there, * * * when I was stepping from the car to the timber dock. * * * We done it that way all the time. I will be 27 the 14th of this month. * * * When I stepped on it [meaning the 6 by 6 guard rail], it shook, and my foot went down, and down 'I went. Q. If that timber, like it was supposed to have been securely fastened had not shook that way, state whether or not you would have fallen. A. No, sir. If it had been square, I would not have been as liable to have fallen. If I had known that timber was loose and would shake there in the condition I found it to be, I would not have stepped across there."

On cross-examination, he testified: "I would not say positive the piece [guard rail] was loose. * * * As to whether I saw it or just imagined it was slick [meaning the 6 by 6 timber], will say that reason will teach any man if you keep sliding pieces over there it will get slick. I don't know whether it was real slick or not; I couldn't say positive. * * * I saw that piece was creeled the day before. I didn't pay any attention to it then to tell whether it was slick. I just imagined it was slick. I didn't imagine it was creeled; I know positive it was creeled, and I don't know positive that it was slick. I imagined it was because the timber went over it. If they put timber over it, I would expect it to get slick."

The evidence shows that underneath this guard rail there were timbers, which were called "sliding skids," so arranged that they could be pulled out at right angles with the platform and guard rail and hold lumber that was being moved from the platform to the car, and prevent it falling in the space between the car and the platform. When these timbers were not in use, they were shoved back under the guard rail and platform, where they were held in some way not shown by the evidence. These sliding skids were pulled out and in use on the occasion in question.

Plaintiff further testified in regard to the condition of the guard rail: "When the bolts pushed over, that caused it to creel over. I don't know whether it was loose or not. As to whether I am unable to tell you, will say that when my feet stepped there the piece gave with me. The timber wasn't perfectly loose, of course; you couldn't pick it up and shove it around. You couldn't do that, because the bolts were in it. I couldn't tell you how loose it was. It did take two men 'with

144 S.W.—20

cant hooks to raise it up, in order to pull out these sliding skids; that is the way they got them out."

Upon the issue of whether the guard rail was loose, the defendant introduced the following testimony:

Minter, a witness for defendant, testified: "I do not think that timber in question here was loose; in fact, I am positive that it was not loose. It was slightly tilted toward the car, enough so that it could be observed by the naked eye, all right. That timber is fastened with bolts that go through the timber upon which they are placed and fastened with taps. I have used that six-inch timber in question myself quite frequently in stepping across from the car to the dock, and vice versa. In stepping across there, I have never been able to detect any motion or slipping of that part at all."

Jeff Jackson testified: "This 6 by 6 kind of leaned toward the car a little slanting. I knew it was slanting, because I looked with my eyes and saw it was kind of slanting. It was not loose. I know it wasn't, because I stepped on it from the car. I couldn't tell you how often I stepped on it the day before and that day. I stepped across that piece a good many times. In loading the car there, I never felt it give or spring with me."

Webb Tarver testified: "If it was loose on there, I couldn't detect it, because I loaded there so much I got used to it. I never did fall off; it never give down with 'me. It has never turned with me that I know of, and I am loading there all the time. I have never seen any of the timbers loose there."

Webster Holt testified: "I had walked across from that dock to the car and from the car to the dock. That 6 by 6 was not loose. I walked across there many times. It never give or moved a bit with me."

C. W. Richards, shipping clerk for defendant company, testified with reference to the six-inch guard rail in question, as follows: "As to the condition I found that timber in that is in question, will say that as soon as I got Carl [plaintiff] off to the drug store I went back and made a thorough examination, to see if anything was defective—anything that could have caused him to have made the fall. I knew the timber was creened; had been creened there about three-eighths of an inch at the square. The timber was in the same condition, but was thoroughly fast; it couldn't be moved by hand at all, and was bolted with a three-quarter bolt. The top of the bolt on the top of the timber had about a 2½ inch washer under the bolt, and the bolt goes down through a 10 by 10, and is fastened in there with washers. The timber was absolutely solid and couldn't be moved. As to how long that condition that I saw it in then has continued on, will say that it is still in the same condition, or rather worse than it was then, as to the creening. It is tight now; the bolts still

hold it. The bolts have it pulled down tight, although it is creened over, and has the bolts bent. The timber striking against it may bend them over."

He further says: "Several were there and looked at the place of the accident and examined the timber with me; Mr. Allen.was one. He and I both got on it and stood up on it. That was a few days after the accident, probably three or four days. The result was that we found the timber couldn't be moved by ordinary means. Those who were there putting their weights on the timber at the time were my brother, Mr. Allen, and myself. * * * We both got on it at the same time. It did not give, and was not loose so it would move under our weight. We put our weight on it and shook it, and tried to move it and see if it would give by springing up in different ways by working at it. I weigh 185, my brother weighs about the same, and Mr. Allen is heavier. I suppose he weighs 210."

C. M. Allen, the mill foreman, testified: "I remember having met the two Mr. Richards and having seen the place and the happening that Mr. Richards had just described. It is a fact as he has told it here. That timber was not loose."

Upon this testimony, we do not think the trial court erred in instructing a verdict for the defendant.

[1] In so far as the alleged negligence of the defendant consisted in the slant, or, as the plaintiff expressed it, the "creel" of the guard rail, all the testimony, including that of plaintiff, shows that he knew the rail was in this condition at the time he put his foot on it. Knowing this, he must be charged with knowledge of whatever danger there was in stepping upon the rail when it was in this slanting position. Such danger, if any, resulted from a law of physics of which all persons are presumed to have knowledge, and in stepping upon the slanting rail in disregard of this law plaintiff assumed the risk of any injury that might be caused him thereby.

[2] In regard to the alleged negligence on the part of the defendant in allowing the rail to become slick and loose, the testimony does not raise the issue of its being in such condition. Plaintiff says he does not know whether it was slick, but just "imagined that it was," because timber had been pushed over it so often that he would expect it to get slick. This is all the testimony upon this issue, and it certainly does no more than raise a surmise of suspicion that the rail may have been slick. While plaintiff testified on direct examination that he would not have fallen if the rail had not been loose, and that when his foot "stepped there the piece gave with" him, he says, on cross-examination, that he "would not say positive

that the piece was loose, and that he does not know whether it was loose or not," and further says that it took two men with a cant hook to raise or loosen it sufficiently to allow the sliding skids to be pulled from under it. We think this testimony standing alone would not be sufficient to sustain a finding that plaintiff's foot slipped because the guard rail was loose. When the undisputed testimony of defendant's witnesses, before set out, which shows that the rail was not loose, is considered, we think it clear that the evidence fails to raise the issue of plaintiff's injury being caused by the alleged loose condition of the guard rail. As before said, we think the evidence does no more than raise a surmise or suspicion that the rail was in the condition alleged in the petition, and, this being the only ground upon which negligence was charged and the liability of the defendant predicated, the court properly instructed a verdict for the defendant.

It follows that the judgment of the court below should be affirmed; and it has been so ordered.

Affirmed.